*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *No. 2:13-cr-176-GZS* |
| | ) | |
| *RICHARD MAGEE,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS AND*
*MEMORANDUM DECISION AND ORDER ON MOTIONS TO SEVER,*
*TO EXCLUDE TESTIMONY, AND FOR BILL OF PARTICULARS*

Defendant Richard Magee, charged with one count of possession of firearms by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One), six counts of distribution of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Two, Three, and Five through Eight), one count of possession with intent to distribute a mixture or substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Eighteen), seven counts of use of a telephone in the commission of the crimes of distribution or attempted distribution of cocaine, in violation of 21 U.S.C. § 843(b) (Counts Ten through Sixteen), one count of corruptly persuading a witness to provide false and misleading testimony to investigators in relation to an official proceeding, to wit, a federal grand jury investigation, in violation of 18 U.S.C. § 1512(b)(1) (Count Nineteen), and one count of conspiring to persuade a witness to provide false and misleading testimony to investigators in relation to an official proceeding, to wit, a federal grand jury investigation, in violation of 18 U.S.C. §§ 1512(k) and 1512(b) (Count Twenty), *see* Superseding Indictment (ECF No. 31) at 1-6, seeks to suppress evidence obtained as the result of intercepted telephone conversations between himself and David Jones (the "Wiretap Evidence"), an October 4, 2013, search of his person and vehicle, an

October 4, 2013, search of his residence pursuant to a warrant issued by this court, and intercepted telephone conversations between himself and others while he was detained at the Cumberland County Jail from October 4-9, 2013 (the "Jail Calls"), *see* Defendant's Motion to Suppress/Exclude Evidence and Request for Testimonial Hearing, including *Franks* Hearing ("Motion To Suppress") (ECF No. 122) at 1-2; Defendant's <u>Supplemental</u> Motion to Suppress Jail Calls (Evidence Related [to] Intercepted Telephone Communication Between Defendant and Others While Detained at the Cumberland County Jail) ("Suppl. Motion To Suppress/Jail Calls") (ECF No. 150) at 1 (underline in original); Defendant's <u>Supplemental</u> Motion to Suppress Wiretap Evidence ("Suppl. Motion To Suppress/Wiretaps") (ECF No. 151) at 1 (underline in original).

The defendant also moves for severance of his trial on Counts One, Nineteen, and Twenty from trial on the remaining counts against him, *see* Defendant Richard Magee's Motion for Relief from Prejudicial Joinder, Pursuant to Federal Rules of Criminal Procedure, Rule 14, (Severance of Counts 1, 19 & 20 from Counts 2-18 for Separate Trials) ("Motion To Sever") (ECF No. 124) at 1, exclusion of the grand jury testimony of Eric Lamontagne, *see* Defendant'[s] Motion To Exclude Grand Jury Testimony of Eric Lamontagne and any Evidence Garnered from his Testimony ("Motion To Exclude") (ECF No. 127) at 1-2, and a bill of particulars as to Counts Nineteen and Twenty, *see* Defendant Richard Magee's <u>Amended</u> Motion for a Bill of Particulars ("Motion for Particulars") (ECF No. 128) at 1-2 (underline in original).

By decision dated July 11, 2014, I denied the defendant's request for a so-called *Franks* hearing with respect to alleged material false statements in the affidavit submitted in support of the warrant to search his residence. *See* ECF No. 205. On appeal, Judge Singal upheld that ruling. *See* ECF No. 210.

On August 7, 2014, I held an evidentiary hearing during which the defendant appeared with counsel, the government presented one witness and offered 13 exhibits, all of which were admitted with objection, and the defendant offered eight exhibits, all of which were admitted without objection.[1]  I then heard oral argument on all of the pending motions.  The government withdrew its opposition to that portion of the Motion To Suppress pertaining to the October 4, 2013, search of the defendant's person and vehicle.

In view of that concession, and for the reasons that follow, I recommend that the Motion To Suppress be granted without objection as to the October 4, 2013, search of the defendant's person and vehicle and otherwise denied and that the two supplemental motions to suppress be denied, and I deny the motions to sever and for a bill of particulars and deny the motion to exclude in part, insofar as it seeks the exclusion of the Lamontagne testimony, and deem it moot in part, insofar as it seeks a hearing and an order for a turnover of documents.

## I.  Motions To Suppress

### A.  Wiretap Evidence

On June 25, 2013, July 18, 2013, July 29, 2013, August 28, 2013, and September 7, 2013, this court authorized the wiretap intercepts of various cellular telephones allegedly used by an individual identified as David Jones.  *See* Motion To Suppress at [3]; Government's Memorandum of Law in Opposition to Defendant's Motion To Suppress Wire Intercepts ("Opposition/Wiretap Evidence") (ECF No. 166) at 2.  In the government's parlance, the June 25 wiretap was of Target Telephone 3, or "TT3," the July 18 wiretap of TT4, the July 29 wiretap of TT5, the August 28 wiretap also of TT5, and the September 7 wiretap of TT6.  *See*

---

[1] The parties offered evidence bearing only on the motions to suppress the Jail Calls and the motion to exclude the Lamontagne testimony.

Opposition/Wiretap Evidence at 2.[2]  Some of the calls placed from these phones are alleged to be between Jones and the defendant.  The defendant argues that the interception of these calls violated Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-22 ("Title III") in that the government failed to demonstrate the necessity, or "probable cause plus," for the requested wiretaps.  *See* Motion To Suppress at [7]-[8]; Motion To Suppress ("Joshua Magee Motion") (ECF No. 119), incorporated by reference in Motion To Suppress, at 7-9.  The government responds that, as to each, the requisite showing of necessity was made.  *See* Opposition/Wiretap Evidence at 4-10.

The defendant also argues in conclusory fashion that the government failed to demonstrate probable cause for the wiretaps, violating Title III and offending his Fourth Amendment rights, and violated the post-authorization procedures of Title III, including its requirements to make 10-day reports, minimize interception, and make and produce an inventory.  *See* Motion To Suppress at [6]-[8]; Joshua Magee Motion at 9-10.

For the reasons that follow, I conclude that none of these challenges has merit.  Accordingly, I recommend that the Motion To Suppress be denied insofar as it concerns the Wiretap Evidence, and the Suppl. Motion To Suppress/Wiretaps be similarly denied.

### 1.  Probable Cause (Title III and Fourth Amendment)

The wiretaps at issue were authorized by this court upon its determination that the applications and the accompanying affidavits of United States Drug Enforcement Administration ("DEA") Task Force Agent John P. Bourque demonstrated, *inter alia*, probable cause to believe that the target subjects and others would use the target telephones in connection with drug

---

[2] The government explains that TT1 and TT2 were used by another individual, Robert Evon, and predated information that Evon was dealing with Jones, which led to the request for wiretaps on Jones' phones, beginning with TT3.  *See* Opposition/Wiretap Evidence at 4 n.1.

trafficking and other offenses. *See, e.g.*, Order Authorizing the Interception of Wire and Electronic Communications (ECF No. 2), *In re Application of United States for Order Authorizing Interception of Wire & Elec. Commc'ns, etc.* ("*In re TT3*"), No. 2:13-mc-132-NT (D. Me. June 25, 2013), ¶¶ 2-3.

For purposes of both Title III and the Fourth Amendment, these court-authorized wiretaps are presumed lawful, and the defendant bears the burden of demonstrating their illegality. *See, e.g., United States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008) (observing, in context of Title III challenge, "Once a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity."); *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) (observing, in context of Fourth Amendment challenge, "The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality. Where the police have acted pursuant to a warrant, the independent determination of probable cause by a magistrate gives rise to a presumption that the arrest or search was legal.") (citation omitted).

The defendant makes only one argument that seemingly goes to the issue of probable cause: that the affidavits submitted in support of the wiretap authorizations alleged primarily that David Jones and other individuals had committed or were committing *marijuana* trafficking crimes and failed to demonstrate that he (the defendant) had any involvement in *those* crimes, although he was named as a target in the TT5 and TT6 applications. *See* Motion To Suppress at [7]. Yet, as the government observes, *see* Opposition/Wiretap Evidence at 10, the applications

and affidavits are framed in terms of "controlled substances[,]" *see, e.g.*, Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Bourque Aff. 3") (ECF No. 1-3), *In re TT3*, ¶ 6(a)-(c).

In any event, the Bourque affidavits need only have provided probable cause to believe that there was "a fair probability that a wiretap [would] uncover evidence of a crime." *United States v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999). "A wiretap application need not provide probable cause of criminal activity for each person named in an application[.] What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in an illegal operation." *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985) (citations omitted). The defendant articulates no challenge to the finding that the affidavits established probable cause to believe that the Jones telephones were being used in an illegal operation. *See* Motion To Suppress at [6]-[8].

### 2. Post-Authorization Procedures (Title III)

At oral argument, the defendant's counsel clarified that her client no longer presses his points regarding the government's duties to make reports and an inventory. Hence, the Motion To Suppress and the Suppl. Motion To Suppress/Wiretaps should be denied as to those items. His counsel also conceded that the defendant has no evidence that the government could have engaged in more effective minimization. In circumstances in which, as here, the government makes a *prima facie* showing that its minimization efforts were reasonable, this is fatal to a challenge on minimization grounds. *See, e.g., United States v. Lopez*, No. CRIM. 99-79-P-C, 2000 WL 761977, at *6 (D. Me. Apr. 28, 2000), *aff'd*, 300 F.3d 46 (1st Cir. 2002) ("[O]nce the issue of minimization has been raised, the Government must then make a *prima facie* showing that its minimization efforts were reasonable. Once such a showing has been made, the burden

shifts to the defendant to demonstrate that more effective minimization could have taken place."); *see also* Opposition/Wiretap Evidence at 10-14 (describing government's minimization efforts).

Accordingly, the Motion To Suppress and the Suppl. Motion To Suppress/Wiretaps should be denied to the extent that they challenge the government's compliance with Title III's post-authorization procedures.

### 3. Necessity (Title III)

### a. Applicable Legal Standards

The so-called "necessity" requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Rivera-Rosario*, 300 F.3d 1, 18 (1st Cir. 2002) (citation and internal quotation marks omitted). An application for an order authorizing the interception of a wire, oral, or electronic communication must include, *inter alia*:

> **(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> ***
>
> **(f)** where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).

In issuing an order authorizing wiretapping, an issuing judge must, *inter alia*, determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *Id*. § 2518(3)(c).

To demonstrate necessity, "the government is not required to show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." *Rivera-Rosario*, 300 F.3d at 19 (citations omitted). Instead, "the government must demonstrate that it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. López*, 300 F.3d 46, 52 (1st Cir. 2002) (citation and internal quotation marks omitted).

In assaying the necessity for a wiretap, the court should consider the nature of the alleged crimes and may give weight to the opinion of investigating agents that, in the circumstances described, other means of investigation were too dangerous and might be counterproductive. *See, e.g., In re Dunn*, 507 F.2d 195, 197 (1st Cir. 1974). "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000). Gaps in an investigation, and a need to corroborate confidential source information, are appropriate factors to consider in determining necessity. *See, e.g., United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir. 1991).

### b. Standard of Review

As noted above, "[o]nce a wiretap has been authorized by a judge, it is presumed proper and the burden is on the defendant to prove its invalidity." *Verdin-Garcia*, 516 F.3d at 890. Typically, the task of a reviewing court examining an issuing judge's wiretap order in the context of a motion to suppress is to "examine[] the face of the affidavit and decide[] if the facts set forth in the application were minimally adequate to support the determination that was made[.]"

*United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003) (citation and internal quotation marks omitted). "That is, the sufficiency of the affidavit is to be upheld where the [reviewing] court determines that the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." *López*, 300 F.3d at 53 (citation and internal punctuation omitted); *see also, e.g., Rivera-Rosario*, 300 F.3d at 19 n.23 ("When reviewing a wiretap application, it is not our province to engage in *de novo* review of an application; instead, we test it in a practical and commonsense manner to determine whether the facts which it sets forth are minimally adequate to support the findings made by the issuing judge.") (citations and internal punctuation omitted).

The same standard pertains when the district court "is 'reviewing' the prior district court authorization of a wiretap application in the course of a suppression motion challenging the facial sufficiency of the affidavit." *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989). "This inquiry is not rigid or rule-oriented; to the precise contrary, Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness." *United States v. David*, 940 F.2d 722, 728 (1st Cir. 1991) (citation and internal quotation marks omitted).

### c. Discussion

The defendant argues that (i) the initial wiretap was unnecessary in that the affidavit submitted in support of that application established that traditional investigatory tools had been rich, varied, and productive, (ii) subsequent wiretaps were unnecessary and, hence, impermissible, and, (iii) even if the initial wiretap was lawful, the government sought later wiretaps as a shortcut rather than resorting to traditional investigative techniques to follow all leads after receiving information from prior wiretaps. *See* Joshua Magee Motion at 7-9. He adds

that there were no independent judicial findings regarding the necessity of the wiretaps, but rather only orders containing boilerplate language. *See id*. at 9.

As the government rejoins, the affidavit submitted in support of the initial wiretap at issue, that of TT3, made clear that, while pre-wiretap investigation had generated much useful information about Jones' drug trafficking as of September 2012, investigators lacked knowledge of how and when Jones obtained additional supplies or the locations at which he received deliveries, the locations he used to store drugs and drug proceeds, the full extent of others' participation in his enterprise, and the dates, times, and places of commission of drug trafficking and money laundering offenses. *See* Opposition/Wiretap Evidence at 5; *see also* Bourque Aff. 3 ¶¶ 101, 111, 114. Bourque explained in detail the specific shortcomings and/or undue risks of traditional investigative techniques, for example, limits to sources' knowledge, the limited utility of pole cameras given the number of locations involved, the risks of attempting to develop new sources or use undercover agents, and the limits and risks of surveillance. *See id*. ¶¶ 101-41.

In addition, in support of each successive wiretap application, Bourque detailed:

1.      The progress of the investigation, including the techniques used as of that date, see Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Bourque Aff. 4") (ECF No. 1-3), *In re Application of United States for Order Authorizing Interception of Wire & Elec. Commc'ns, etc*. ("*In re TT4*"), No. 2:13-mc-154-NT (D. Me.), ¶¶ 16-86; Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Bourque Aff. 5") (ECF No. 1-3), *In re Application of United States for Order Authorizing Interception of Wire & Elec. Commc'ns, etc*. ("*In re TT5*"), No. 2:13-mc-156-NT (D. Me.), ¶¶ 16-54; Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Bourque Aff. 5B") (contained in ECF No. 1),

*In re Application of United States for Order Authorizing Interception of Wire & Elec. Commc'ns, etc.* ("*In re Extension of TT5*"), No. 2:13-mc-177-NT (D. Me.), ¶¶ 15-52; Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Bourque Aff. 6") (ECF No. 1-1), *In re Application of United States for Order Authorizing Interception of Wire & Elec. Commc'ns, etc.* ("*In re TT6*"), No. 2:13-mc-181-NT (D. Me.), ¶¶ 15-56; and

2.      Knowledge gaps that remained despite those efforts, together with risks and problems with the use of techniques apart from the requested wiretap, *see* Bourque Aff. 4 ¶¶ 87-120; Bourque Aff. 5 ¶¶ 55-91; Bourque Aff. 5B ¶¶ 53-112; Bourque Aff. 6 ¶¶ 53 [sic]-114.

These facts were at least minimally adequate to support the findings of necessity made by the court in authorizing the wiretaps.

Finally, the defendant's challenge to the sufficiency of the orders authorizing the wiretaps is without merit. He observes that the court used boilerplate language stating that "[t]he application and supporting affidavit have adequately demonstrated that normal investigative techniques have been tried and have failed, or had limited success, and reasonably appear unlikely to further succeed if continued." Joshua Magee Motion at 9. He contends that this was neither "an independent judicial finding of necessity under 18 U.S.C. § 2518(3)(C)" nor the sort of analysis required by *United States v. Giordano*, 416 U.S. 505, 533 (1974). *Id.*

However, neither of these authorities requires a particular level of discussion in a wiretap order. The cited portion of section 2518 states that a judge may enter an order approving a wiretap "if the judge determines on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(3)(c). The cited portion of *Giordano* observes that Article III "forbids extensions of prior authorizations without

consideration of the results meanwhile obtained." *Giordano*, 533 U.S. at 533. The court, in the passage that the defendant criticizes, indicated that it made those determinations. No more was required.

For all of these reasons, the Motion To Suppress should be denied insofar as it seeks suppression of the Wiretap Evidence, and the Suppl. Motion To Suppress/Wiretaps should also be denied.

## B. Search Warrant

The defendant next seeks to suppress evidence seized from his home in Gorham, Maine, pursuant to a search warrant issued by this court on October 2, 2013, on the strength of an affidavit of Bourque. *See* Motion To Suppress at [8]-[14]; Affidavit ("Bourque Aff./Search Warrant"), contained in Application for a Search Warrant, Exh. 1 (ECF No. 188-1) to Defendant's Memorandum Submitted in Support of Request for *Franks* Hearing made in Defendant's Motion to Suppress [Document # 122] (ECF No. 187). For the reasons that follow, I recommend that this aspect of the motion be denied.

### 1. Applicable Legal Standards

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). A defendant bears the burden of proving the illegality of a warrant. *See, e.g., Longmire*, 761 F.2d at 417. Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996). "Yet such review

cannot start from scratch. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* (citation and internal quotation marks omitted).

"In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Ribeiro*, 397 F.3d at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched." *Id.* at 49 (citation and internal quotation marks omitted).

"[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005); *see also, e.g., United States v. Woodward*, 173 F. Supp.2d 64, 67 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) ("When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.") (citation omitted).

## 2. Discussion

The defendant's challenge to the sufficiency of the Bourque affidavit to establish probable cause for the issuance of the October 2, 2013, search warrant is largely predicated on the excision of statements that he argues were either tainted, because derived from illegal wiretaps of Jones' cell phones, or false or materially misleading. *See* Motion To Suppress at [8]-[14]. However, he contends that even if the court rejects those arguments, it should nonetheless

13

conclude that the affidavit on its face is insufficient to confer probable cause to believe that evidence of drug trafficking would be found in his home on October 4, 2013, because the information was stale. *See id.* at [14].

As noted above, I have recommended that the court reject the defendant's argument that the wiretaps were illegal, and the court has previously rejected his bid for a *Franks* hearing with respect to asserted false statements and material omissions. Likewise, his staleness argument is unpersuasive.

The defendant points out that Bourque relied in part on incidents that allegedly occurred in August and September 2011, more than two years before the date of his application for a search warrant. *See id.* at [11]; *see also* Bourque Aff./Search Warrant ¶ 6. Nonetheless, Bourque went on to describe the content of calls between the defendant and Jones intercepted from September 16, 2013, through September 30, 2013, and observations of the defendant on September 20, 2013, that collectively were indicative of drug trafficking and of the presence of drugs at the defendant's home. *See* Bourque Aff./Search Warrant ¶¶ 9-24. The affidavit, as a whole, sufficed to supply probable cause to believe that evidence of drug trafficking would be found at the defendant's residence as of October 2, 2013. *See, e.g., United States v. Jenkins*, Criminal No. 08-67-P-H, 2008 WL 4410911, at *7 (D. Me. Sept. 29, 2008) (rec. dec., *aff'd* Oct. 21, 2008) ("Year-old information suggestive of drug trafficking, freshened by same-day corroboration of the same, is not stale."); *United States v. Reiner,* 382 F. Supp.2d 195, 198-99 (D. Me. 2005) (given existence of advertisements contemporaneous with warrant application suggesting that health club was engaged in business of prostitution, "slightly more distant but still recent historical data [suggesting the same] were also relevant.") (footnote omitted).

## C. Jail Calls

### 1. Factual Background

On October 4, 2013, the defendant was arrested following a search of his residence and detained at the Cumberland County Jail (the "Jail") in Portland, Maine, pending a detention hearing on October 9, 2013. During that time, he made a number of calls to his son, Joshua Magee, and others that were recorded and ultimately shared with the DEA.

The Jail uses an Offender Communication System ("OCS") to control all calls from the inmate telephone system. *See* Cumberland County Sheriff's Office Policy and Procedure, Inmate Telephone System ("Phone Policy"), Gov't Exh. 1A, at 3, ¶ G(1).[3] The Phone Policy provides, "At the time of booking each inmate is issued a Telephone Identification Number (TID)" that is "specific to that one inmate" and "must be entered by the inmate to place a call or order commissary from the inmate[']s account." *Id*. at 4, ¶ G(3). Pursuant to Phone Policy, "[f]or completed calls to numbers not associated with an attorney, court or other legal agency the OCS will also make a digital recording of the entire phone call." *Id*. at 4, ¶ G(6).

The Phone Policy further provides that "[c]alls made using the OCS that has been set to record per policy may be monitored by the Sheriff or designated personnel." *Id*. at 5, ¶ H(1) (boldface omitted). Pursuant to the Phone Policy:

> 2.  Inmates will be informed that all telephone calls are subject to being monitored. This will be done by inmate handbook, posted on the phones and a played recording message before the recipient accepts the call.
>
> 3.  Calls may be intercepted, monitored and disclosed based on the following criteria:
>     a.  The call is monitored by the investigator in the normal course of employment while engaged in an activity that is necessary to the

---

[3] The Phone Policy was revised in October 2013. *See* Phone Policy at 1. It is not clear whether this occurred before or after the defendant was detained; however, the portions of the policy on which the government relies were the same in the prior version of that document. *See* Gov't Exh. 1C.

administration of criminal justice or investigating offenses relating to the security and orderly running of the facility.

b. Inmates receive written notification that calls are intercepted.

- Inmates receive a warning statement in booking with their TID number that states calls may be monitored or recorded.

c. Written notification is posted on each phone in the facility

- Conspicuously posted on each phone in the housing unit is a notice that calls may be monitored and recorded

d. The recipient is notified before the call is accepted

- Each call is begun with a statement warning the inmate and the call's recipient that the calls may be monitored or recorded.

*Id*. at 5, ¶ H(2)-(3).

As part of the booking process, the Jail provides inmates with handbooks and release forms assigning individual TID numbers. The release form contains the statement, "I understand and agree that telephone calls are subject to monitoring, recording, and may be intercepted or divulged." Dft's Exh. 1. The release form assigning the defendant his TID number was neither signed nor dated by him. *See id*. Release forms typically are transferred to an inmate's housing unit. Holmes has no personal knowledge whether, as prescribed by Jail policy, the defendant was provided either the handbook or the release form as part of the booking process.

The Jail permits inmates to make at least two free phone calls from the booking room – that is, calls made without using their TID numbers – upon completion of the booking process. Inmates placing calls from their housing units are required to use their TID numbers. Phones in both the booking room and the housing units have placards that state, under the heading Billing Arrangements at the bottom of the placard, "Calls from this phone may be monitored or recorded[.]" Gov't Exhs. 3 & 3A. When inmates place a call from any Jail phone, they and the individual whom they are calling also hear a warning that calls may be monitored or recorded. Neither the placard nor the recording advises that calls may be divulged. *See, e.g., id*.

While the defendant was housed at the Jail from October 4-9, 2013, his calls from that facility were recorded. He made 31 calls using his TID number, *see* Gov't Exh. 10, and at least one call on October 4, 2013, without a TID number, *see* Gov't Exh. 9. On October 4, 2013, he placed a call from the booking room to Joshua Magee during which, at the outset, an operator warned, "This call may be monitored or recorded." Gov't Exh. 4 at 1 (boldface omitted). Shortly afterward, Joshua Magee stated, "Cheryl Holmes monitors the calls down there[,]" and the defendant responded, "Yeah, yeah[.]" *Id.* Later in the call, the following exchange took place:

JM:  I'm going to make sure money is on your books right away.

RM:  Cool, that way I can get some commissary.

JM:  I'll have money . . .

RM:  I got a pin, I got pin number, I don't know what that means.

JM:  A pin number?

RM:  Yeah, for the phone system . . .

JM:  What does that mean?

RM:  I don't know for the phone.

JM:  For a phone?

RM:  I don't know.

JM:  Should I write it down?  Write it down?

RM:  I don't know, this is the information they gave me.  Magee . . . oh telephone ID number.

JM:  Telephone ID number?

RM:  Yeah. . .  43035. . .

*Id.* at 5.

On October 9, 2013, Cheryl Holmes, a Cumberland County Sheriff's Department detective responsible from fielding requests from outside agencies to download and monitor inmate calls, received a request from DEA agent Paul Buchanan for recordings of calls placed by the defendant. *See* Gov't Exh. 2. On October 10, 2013, she supplied him with a CD containing recordings of 32 calls. *See id.*

By memorandum to Holmes dated October 9, 2013, Sgt. Gilpatrick, whom Holmes described as being in charge of the Cumberland County Sheriff's Office's Gang Task Force, indicated that he had been approached that day by a classification officer with information of interest about the defendant, had listened to recordings of the defendants' and other inmates' calls, and had forwarded information to Holmes to provide to the DEA. *See* Dft's Exh. 8. He noted that the defendant had been released from custody that day. *See id.*[4]

## 2. Discussion

The defendant seeks to suppress the Jail Calls on the bases that the Jail violated Title III and the Fourth Amendment when it intercepted and shared his calls without a warrant and for the purpose of a criminal investigation rather than for legitimate Jail safety reasons. *See* Joshua Magee Motion at 10-12; Suppl. Motion To Suppress/Jail Calls at [1]-[4].

The defendant acknowledges that the First Circuit has upheld the admission of recordings of inmate telephone conversations on grounds that, (i) for purposes of both the Fourth Amendment and Title III, the inmate consented to the recording, (ii) the calls were not

---

[4] At oral argument, the defendant's counsel contended that the evidence, including Dft's Exh. 8, showed that Sgt. Gilpatrick had targeted her client for monitoring and then caused recordings of his calls to be forwarded to the DEA. However, as the government's counsel rejoined, the evidence indicates that Sgt. Gilpatrick began investigating the defendant's calls on October 9, 2014, the day that the defendant was released from the Jail, and that the DEA's Buchanan independently requested recordings of those calls on the same day. *See* Dft's Exh. 8; Gov't Exh. 2.

"intercepted" for purposes of Title III because jail officials did not target the inmate for monitoring and recording but, rather, recorded the calls in the ordinary course of business, and (iii) disclosure of the recordings to the government was permissible in the circumstances of those cases. *See* Suppl. Motion To Suppress/Jail Calls at [3] (citing *United States v. Novak*, 531 F.3d 99 (1st Cir. 2008); *United States v. Conley*, 531 F.3d 56 (1st Cir. 2008); *United States v. Lewis*, 406 F.3d 11 (1st Cir. 2005); *United States v. Footman*, 215 F.3d 145 (1st Cir. 2000)).

However, he argues that his case is distinguishable in that he was personally targeted for recording and monitoring, he did not sign the written form acknowledging that his calls could be monitored, recorded, and divulged and consenting to the same, and the oral warning at the beginning of collect calls was not sufficient to provide notice that he was waiving his rights to protection under the Fourth Amendment and the Wiretap Act. *See id*.

The government counters that the defendant's Title III challenge fails because the Jail Calls were lawfully intercepted pursuant to the so-called consent and "law enforcement" exceptions. *See* Government's Opposition to Defendant's Motion To Suppress Jail Calls ("Opposition/Jail Calls") (ECF No. 162) at 2-5. It argues that the Fourth Amendment challenge falters because the defendant fails to establish that he had a subjective expectation of privacy in the calls or that any such expectation was objectively reasonable and, in any event, he consented to their recording. *See id*. at 5-6. The government is correct.

### a. Title III

The defendant contends that Sgt. Gilpatrick targeted him, monitored his calls, and supplied them to the DEA, as a result of which the calls were not recorded in the ordinary course of business and, accordingly, the law enforcement exception does not apply. *See, e.g*., Suppl. Motion To Suppress/Jail Calls at [3]. However, the Phone Policy provides for the digital

recording of every phone call placed by an inmate unless the number dialed is associated with an attorney, court, or other legal agency. Inmates are warned by various means, including placards on phones and oral warnings at the start of calls, that their calls are subject to monitoring and recording. Sgt. Gilpatrick did not initiate the recording of the defendant's calls. The defendant did not come to his attention until October 9, 2013, the day of the defendant's release from the Jail. While Sgt. Gilpatrick forwarded information to Holmes to provide to the DEA, the DEA's Buchanan independently requested recordings of the defendant's calls on the same day.

In these circumstances, the recordings were not interceptions for purposes of Title III. *See, e.g., Lewis*, 406 F.3d at 19 ("We hold that a recording made pursuant to a routine prison practice of monitoring all outgoing inmate calls under a documented policy of which inmates are informed does not constitute an interception for Title III purposes.") (footnote omitted).

Because the calls were not intercepted for purposes of Title III, the disclosure of recordings of the calls did not violate that title. *See, e.g., id.* at 20 ("Because [jail official] did not intercept the call, Title III's restrictions on the use of intercepted communications are inapposite.").

Even had the calls been intercepted pursuant to Title III, the consent exception applies. While the defendant did not expressly consent to the interception of his calls, there is ample evidence that he impliedly consented. Although he did not sign the release form, one can reasonably infer that he received it, having discussed his TID number with Joshua Magee on the day that he was booked into the Jail and having subsequently used his assigned TID number to place more than 30 calls.[5] Inmates also routinely receive copies of the handbook, which warns

---

[5] At oral argument, the defendant's counsel pointed out that it was not clear whether, during the defendant's October 4, 2013, phone call with his son, he was reading his TID number from the release form. She observed that he could have been told the number orally and written it down on a piece of paper. While that is possible, it does not seem
(*continued on next page*)

them that all calls are subject to being monitored. While Holmes did not personally know whether the defendant received a copy, there is no evidence that he did not. In any event, the defendant was informed by means of both phone placards and oral warnings that his calls might be monitored or recorded. He also discussed with his son the fact that Holmes monitored inmates' calls and spoke in coded language, indicating his awareness of the interceptions.[6] Despite this knowledge, he proceeded to use the Jail phones, impliedly consenting to their interception for purposes of Title III. *See, e.g., Novak*, 531 F.3d at 102 (inmate consented to monitoring his calls, for purposes of Title III, when he proceeded with calls from jail despite automated message warning that his calls were being monitored).

Because the Jails Calls were intercepted by consent, a means allowed by Title III, Holmes did not run afoul of Title III in disclosing the contents of those intercepted calls to the DEA. *See, e.g., Conley*, 531 F.3d at 60.

### b. Fourth Amendment

As the government notes, the proponent of a motion to suppress must establish that a challenged governmental action "intruded upon some legitimate expectation of privacy of the proponent[.]" Opposition/Jail Calls at 5 (quoting *United States v. Soule*, 908 F.2d 1032, 1034 (1st Cir. 1990)). The defendant fails to establish that he believed his phone calls were private or that any such belief was reasonable. As noted above, the evidence indicates that the defendant was well aware that his calls were not private. And "courts have generally concluded that neither an inmate (including a pretrial detainee) nor a person who knowingly receives a call from

---

likely, given the Jail's policy of issuing TID numbers *via* the release forms during the booking process and permitting inmates "free" calls from the booking room once they have completed that process.

[6] The government offered, as an example of coded language, a transcript of an October 5, 2013, call between the defendant and his son that includes references to ugly ducklings, swans, and spaghetti. *See* Gov't Exh. 5 at 2-3. At oral argument, the defendant's counsel posited that the defendant may have wished not to be overheard by other inmates. It is more likely that, as the government's counsel argued, he used code language because he was aware that his calls were being monitored and/or recorded.

the inmate has a reasonable expectation of privacy in telephone calls between them[.]" *United States v. Novak*, 453 F. Supp.2d 249, 257 (D. Mass. 2006), *rev'd on other grounds*, 531 F.3d 99 (1st Cir. 2008).

In any event, even if the defendant established that he had a legitimate expectation of privacy in the Jail Calls, "[a] telephone call can be monitored and recorded without violating the Fourth Amendment so long as one participant in the call consents to the monitoring." *Novak*, 531 F.3d at 101 (citations omitted). As discussed above, the defendant impliedly consented to the monitoring and recording of the Jail Calls.

For all of these reasons, I recommend that the Motion To Suppress be denied insofar as it concerns the Jail Calls, and the Suppl. Motion To Suppress/Jail Calls be denied as well.

## II. Motion To Sever Counts

The defendant moves for severance of his trial on Counts One, Nineteen, and Twenty from trial on the remaining counts against him on the grounds that those counts are misjoined pursuant to Federal Rule of Criminal Procedure 8(a) and, even if properly joined, would cause undue prejudice warranting severance pursuant to Federal Rule of Criminal Procedure 14(a). *See* Motion To Sever at [3]-[8].

The government counters that the counts are properly joined and that the defendant has failed to make the requisite showing of undue prejudice. *See* Government's Response to Defendant Richard Magee's Motion for Severance ("Opposition/Severance") (ECF No. 165) at 2-11. I agree.

Rule 8(a) provides, in relevant part, that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar

character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).

The First Circuit has noted:

We have construed this rule generously in favor of joinder. Further, 'similar' does not mean 'identical,' and we assess similarity in terms of how the government saw its case at the time of indictment. In determining whether counts are properly joined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred.

*United States v. Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006) (citations and internal punctuation omitted).

The defendant argues that Count One, charging him with possession of a firearm by a felon, and Counts Nineteen and Twenty, charging him with witness tampering, are not of the same or similar character as the remaining drug-related counts, are not based on the same act or transaction, and are not parts of a common scheme or plan. *See* Motion To Sever at [6]-[7]. He contends that, of the charged drug offenses, only one, Count Eighteen, is even arguably related to Count One because both charges stem from the search and seizures conducted at his home on October 4, 2013. *See id*. at [7]. However, he asserts that this is an insufficient basis for joinder because the firearms in fact have no connection to the drug charge or the witness tampering charges. *See id*.

He agrees to a joint trial on Counts One, Nineteen, and Twenty because some of the evidence on those counts will overlap but maintains that there is no connection between those counts and the remaining counts. *See id*.

Nonetheless, as the government suggests, *see* Opposition/Severance at 3, Counts One, Nineteen, and Twenty are properly joined not only with Count Eighteen but also with the remaining drug charges, which allege a course of similar conduct from September 26, 2011,

through October 1, 2013, *see* Superseding Indictment at 2-5. Only two of the drug charges, Counts Two and Three, charge conduct occurring in 2011; the rest charge conduct occurring from August 23, 2013, through October 4, 2013. *See id*. The government contends that the defendant possessed the firearms at issue in Count One to protect his drugs and drug proceeds, and the tampering charges arise from events occurring on the day of his arrest on the remaining charges and relate directly to his charged possession of the firearm. *See* Opposition/Severance at 3. In these circumstances, joinder is proper. *See, e.g.*, *United States v. Widi*, No. 09-CR-9-P-S, 2010 WL 580005, at *1 (D. Me. Feb. 12, 2010) (charge of possession of firearm by a convicted felon was properly joined with marijuana distribution charge when "[t]he majority of the relevant evidence was obtained during the same search and [was] pertinent to both charges[,]" and "firearms are commonly 'tools of the trade' for sellers and manufacturers of illegal narcotics") (citation omitted).

As the defendant observes, *see* Motion To Sever at [3], the court has discretion to sever properly joined counts to mitigate prejudice arising from their joinder, *see, e.g.,* Fed. R. Crim. P. 14(a) ("If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . ., the court may order separate trials of counts[.]"). "Three types of prejudice may result from trying a defendant for several offenses during the same trial:"

> (1) the defendant may become embarrassed or confounded in presenting separate defenses; (2) proof that defendant is guilty of one offense may be used to convict him of a second offense, even though such proof would be inadmiss[i]ble in a second trial for the second offense; and (3) a defendant may wish to testify in his own behalf on one of the offenses but not another, forcing him to choose the unwanted alternative of testifying as to both or testifying as to neither.

*United States v. Richardson*, 515 F.3d 74, 81 (1st Cir. 2008) (citation and internal quotation marks omitted).

A "defendant carries the burden of demonstrating prejudice resulting from a failure to sever, but such a showing does not result in an automatic grant of the motion." *United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir. 2012) (citations omitted). "Severance is proper only if there is a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." *Id*. (citations and internal punctuation omitted).

The defendant contends that the joinder of Count One, which charges that he was a felon in possession of a firearm, will cause unfair prejudice because it will allow the government to introduce otherwise inadmissible evidence of his felony convictions, which include a felony drug conviction and a felony money laundering conviction. *See* Motion To Sever at [4]. He reasons that this, in turn, will create the second type of prejudice – a danger that the jury will find him guilty on the drug counts because of his prior drug conviction or give no weight to his testimony because of his prior money laundering conviction. *See id*.

He argues that, while a limiting instruction might lessen the prejudice, it would only confuse the jury in that "[t]o tell a jury to ignore the defendant's prior convictions in determining whether he . . . committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capabilities." *Id.* at [5] (quoting *United States v. McCarter*, 316 F.3d 536, 539 (5th Cir. 2002)).

Nonetheless, at oral argument, the government's counsel represented that, in this case, because firearms and drugs were seized at the same time, the evidence that the government will adduce with respect to both groups of charges will be the same but for the fact of the defendant's prior felony convictions. As to the latter fact, the government's counsel represented that the government is willing to stipulate that the defendant had prior felony convictions, obviating any need to specify the nature of those convictions for purposes of its case-in-chief.

The defendant's counsel argued that this did not fully address her client's concerns because it was possible that the nature of the underlying felonies might be admitted for other purposes such as impeachment and, in any event, the mere fact that he had prior felony convictions is prejudicial. This is an insufficient showing to warrant severance pursuant to Rule 14(a). *See, e.g., United States v. Matthews*, 856 F. Supp.2d 229, 230, 234-35 (D. Me. 2012) (denying request to sever firearms charges from drug charges; noting that "evidence of firearms is routinely admissible in drug trafficking cases, as is evidence of drug trafficking in firearms cases" and risk of prejudice could be addressed at trial through limiting instruction). *See also, e.g., United States v. Turner*, 501 F.3d 59, 72 (1st Cir. 2007) (rejecting argument that district court's refusal to sever felon-in-possession charge prejudiced defendant's entrapment defense; noting, "any possible prejudice was limited by [defendant's] stipulation to his status as a convicted felon").

At oral argument, the defendant's counsel also raised for the first time an additional concern implicating the third type of prejudice: that she intended to advise her client to testify as to the firearm and witness tampering charges but not the drug charges and, if severance were denied, he would be denied his Fifth Amendment right to remain silent on the drug charges, if he wished to exercise his right to testify on the other charges.

The First Circuit has held that "a defendant *may* deserve a severance of counts where he makes a *convincing* showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Richardson*, 515 F.3d at 81 (citation and internal punctuation omitted) (emphasis in original). "The defendant must offer sufficient information so that the court can weigh the considerations of judicial economy against the

defendant's freedom to choose whether to testify as to a particular charge." *Id.* (citation and internal quotation marks omitted). The defendant fails to make this showing.

For all of these reasons, the Motion To Sever is denied.

### III. Motion To Exclude Testimony

The defendant moves to exclude the grand jury testimony of Eric Lamontagne, and evidence garnered therefrom, on the ground that the government compelled that testimony for the sole or dominant purpose of gathering evidence for trial, an abuse of the grand jury process that violated his constitutional rights to a fair trial and due process. *See* Motion To Exclude at [2]-[3].[7]

The defendant also requested that the court afford him a hearing on this motion and order the government to provide copies of the transcript of Lamontagne's grand jury testimony and any other evidence related to Lamontagne's pre-testimonial interview. *See* Motion To Exclude at [1]-[2]. Those requests are moot, the court having held a hearing during which the requested documents were introduced in evidence.

The First Circuit has observed:

> Although the grand jury operates under judicial supervision, it is essentially an independent institution. In recognition of this status, courts afford grand jury proceedings a presumption of regularity. This presumption attaches even after the grand jury has returned an initial indictment. After all, superseding indictments setting forth new charges or adding new defendants are familiar fare. It follows logically that, as a general rule, evidence obtained pursuant to an ongoing grand jury investigation may be offered at the trial on the initial charges.
>
> Notwithstanding the presumption of regularity, prosecutors do not have carte blanche in grand jury matters. However, a party asserting a claim of grand jury abuse must shoulder a heavy burden. One way to carry this burden is to show that

---

[7] At oral argument, the defendant's counsel also suggested that the fact that the government can compel testimony by way of a grand jury subpoena, while a defendant cannot, in itself offends basic notions of fundamental fairness. However, she cited no authority in support of that proposition.

the government used the grand jury principally to prepare pending charges for trial.

***

To assist in the inquiry, courts have devised certain proxies. Thus, if a grand jury's continuing indagation results in the indictment of parties not previously charged, the presumption of regularity generally persists. So too when the grand jury's investigation leads to the filing of additional charges against previously indicted defendants. These are purposes befitting the accepted institutional objectives of the grand jury, and their presence bears convincing witness to the propriety of the prosecutor's stewardship.

*United States v. Flemmi*, 245 F.3d 24, 28 (1st Cir. 2001) (citations and internal punctuation omitted).

The defendant fails to shoulder his heavy burden to overcome the presumption of regularity. As the government observes, *see* Government's Response to Defendant Richard Magee's Motion Related to Grand Jury Evidence ("Opposition/Exclusion") (ECF No. 167), at 1-2, Judge Singal considered and rejected a nearly identical argument by the defendant in the context of a motion to quash a grand jury subpoena issued with respect to a different witness, *see* Order on Motions To Quash Subpoena (ECF No. 17), *In re Grand Jury Subpoena Duces Tecum, etc.*, No. 2:13-mc-224-GZS (D. Me. Dec. 5, 2013).

Although the government's investigation had not as of that time resulted in the issuance of the Superseding Indictment, Judge Singal readily found the government's ongoing investigation into crimes related to the firearms, including its follow-up on evidence obtained from the Jail Calls, proper pursuant to *Flemmi*:

It is undeniably proper for the grand jury to investigate whether the other four seized firearms may involve other criminal activity. After all, "[t]he function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." <u>United States v. R</u>

28

Enterprises, Inc., 498 U.S. 292, 297 (1991) (internal quotations and citations omitted). So long as the Government proffers that the . . . subpoena relates to an ongoing grand jury investigation of seized items that are not currently listed in the Magee Indictment, the subpoena readily appears to be primarily for a proper investigative purpose.

*Id.* at 2-3.

As the government rejoins, this conclusion is, if anything, fortified by the subsequent return of the Superseding Indictment, which predicated Count One on four additional firearms and added the witness tampering charges, Counts Nineteen and Twenty. *See* Opposition/Exclusion at 2; *compare* Indictment *with* Superseding Indictment; *Flemmi*, 245 F.3d at 29 ("[A]ccusations of grand jury abuse can be conclusively rebuffed by a showing that the challenged proceedings led to the joinder of new defendants or the inclusion of new charges.").[8]

The motion accordingly is denied insofar as it seeks the exclusion of the Lamontagne testimony and deemed moot insofar as it seeks a hearing and an order for a turnover of documents.

---

[8] In his brief and through counsel at oral argument, the defendant invited the court to peer behind the curtain of the Superseding Indictment to discern abuse of the grand jury process. *See, e.g.*, Motion To Exclude at [6]-[8]. This approach seemingly flies in the face of *Flemmi*. Even assuming that it is necessary or appropriate to consider these arguments, they are unavailing. The defendant posits that the government had probable cause from the outset to charge all five firearms but strategically chose not to do so to enable it use the grand jury to question hostile trial witnesses in the guise of conducting an ongoing investigation. *See id.* at [6]. However, at oral argument, the government's counsel countered that, although the government had probable cause to charge all firearms, it chose to charge one firearm to comply with the Speedy Trial Act and to conduct a more exhaustive investigation with respect to the remaining firearms, as is its customary practice. It received information at the defendant's bail hearing on October 9, 2013, that someone else might own some of the firearms, followed by the Jail Calls information revealing possible witness tampering in connection with the firearms. It properly employed the grand jury to investigate potential new charges. The defendant also suggests that the government improperly used the grand jury to investigate charges of tampering with a grand jury witness because Lamontagne was not a grand jury witness at the time of the Jail Calls and only became one when he testified before the grand jury on November 5, 2013, in response to a government subpoena. However, the charges at issue relate to the alleged persuasion of Lamontagne to provide false and misleading testimony to *investigators* in relation to a federal grand jury investigation. *See* Superseding Indictment at 6. In any event, as the government's counsel pointed out at oral argument, the government had received evidence of a conspiracy to obstruct justice with respect to ownership of the firearms. It properly used the grand jury to investigate.

## IV. Motion for Bill of Particulars

The defendant finally moves for a bill of particulars, seeking further details with respect to Counts Nineteen and Twenty, the witness tampering charges. *See* Motion for Particulars at [1]-[2]. He argues that the Superseding Indictment fails to provide him with sufficient information to prepare a defense to those counts in that it fails to (i) identify all co-conspirators or participants, (ii) set forth any overt acts alleged to have furthered the conspiracy in Count Twenty or that form the basis of the allegation in Count Nineteen, (iii) identify the precise dates of all alleged wrongful acts, or (iv) set forth the means by which those acts allegedly were accomplished. *See id.* at [2].

As this court has noted:

> Eclipsed by Rule 16 discovery requirements, motions for bills of particulars are seldom employed in modern federal practice. When bills of particulars are pursued, they need only be granted if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause. Whether to grant a motion for a bill of particulars is left to the sound discretion of the district judge, whose decision will be reversed only for abuse of discretion. In exercising its discretion, the trial court will often consider whether the defendant has demonstrated "actual prejudice" from the indictment's lack of specificity; namely, specific evidence or witnesses that the lack of particularization prevented him from obtaining. An indictment that specifies the law that the defendant allegedly violated and provides a temporal framework in which certain conduct is alleged to have occurred is sufficient; "open-file" discovery may obviate the need for greater specificity.

*United States v. Poulin,* 588 F. Supp.2d 64, 67 (D. Me. 2008) (citations and internal quotation marks omitted).

The government points out that Counts Nineteen and Twenty of the Superseding Indictment identify the witness at issue, Count Nineteen specifies the date on which the witness attempted to give false evidence, and Count Twenty sets forth the approximate date range during which the conspiracy is alleged to have occurred. *See* Government's Response to Defendant's

Motion for a Bill of Particulars (ECF No. 163) at 2. It adds that the defendant has been provided, among other things, with intercepted Jail Calls relating to the conspiracy and other investigatory reports, defense counsel has reviewed a transcript of the witness's grand jury testimony, and the government has advised her that the transcript and related investigatory reports can be reviewed at her convenience at the United States Attorney's Office. *See id.*

The allegations in the Superseding Indictment, together with the discovery made available to the defendant, are adequate to prepare his defense on these charges. As this court has observed, a defendant "is not entitled by way of a bill of particulars to obtain details revealing the precise manner in which the government alleges that he committed the crimes charged or the manner in which it will attempt to prove the charges." *United States v. Faucette*, Criminal No. 2:13-CR-79-DBH, 2013 WL 3458182, at *1 (D. Me. July 9, 2013). "The purpose of a bill of particulars is not to provide a defendant with discovery that otherwise would not be discoverable under the criminal rules and *Brady/Giglio*." *Id.*

The motion for a bill of particulars, accordingly, is denied.

## V. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be ***GRANTED*** with respect to the search of the defendant's automobile and person on October 4, 2013, and otherwise ***DENIED*** and that the two supplemental motions to suppress be ***DENIED***, and I ***DENY*** the motions to sever and for a bill of particulars and ***DENY*** the motion to exclude in part, insofar as it seeks the exclusion of the Lamontagne testimony, and ***DEEM*** the motion ***MOOT*** in part, insofar as it seeks a hearing and an order for a turnover of documents.

### ***NOTICE***

***A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for***

*which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 8th day of September, 2014.

/s/ John H. Rich III

John H. Rich III

United States Magistrate Judge
